T.C. Memo. 1997-141


UNITED STATES TAX COURT


ALBERT J. AND HELEN R. DESANTIS, Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 5766-90, 13108-91.       Filed March 18, 1997.


   Albert J. DeSantis, pro se.

   Aaron P. Rosenfeld and George N. Corey, for petitioner Helen
R. DeSantis.

   John A. Freeman, Robin L. Herrell, James W. Ruger, and Nancy
Ortmeyer Kuhn, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


   DAWSON, Judge:   This case was assigned to Chief Special
Trial Judge Peter J. Panuthos pursuant to the provisions of

section 7443A(b)(4) and Rules 180, 181, and 183.[1]  The Court
agrees with and adopts the opinion of the Special Trial Judge,
which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

PANUTHOS, Chief Special Trial Judge:  In a notice of
deficiency dated December 27, 1989, respondent determined
deficiencies in and additions to petitioner Albert J. DeSantis'
(hereinafter petitioner) Federal income tax for 1982, 1983, and
1984:

Docket No. 5766-90

| | | Additions to Tax | | |
| Year | Deficiency | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6661 |
| 1982 | $329,250 | $164,625 | [1] | $82,313 |
| 1983 | 1,326,062 | 663,031 | [1] | 331,516 |
| 1984 | 319,814 | 159,907 | [1] | 79,953 |

[1] 50 percent of the interest due on the deficiency.

The deficiencies and additions to tax are based upon
respondent's claim that petitioner fraudulently, and with intent
to evade tax, failed to report income in the amounts of $658,498,
$2,655,666, and $639,624 on his 1982, 1983, and 1984 returns,
respectively.  While deficiencies in tax and additions to tax
under sections 6653(a)(1) and (2) and 6661 were determined

---

[1]  All section references are to the Internal Revenue Code
in effect for the years in issue, unless otherwise indicated.
All Rule references are to the Tax Court Rules of Practice and
Procedure.

against petitioner Helen R. DeSantis, said deficiencies and additions were resolved prior to trial.[2]

In her amended answer at docket No. 5766-90, respondent asserted that the deficiencies in and additions to petitioner's Federal income tax be increased by the following amounts:

| | | Additions to Tax | | |
| Year | Deficiency | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6661 |
|------|-----------|-----------------|-----------------|-----------|
| 1982 | $64,429.86 | $32,214.93 | [1] | $16,106.97 |
| 1983 | 12,621.33 | 6,310.67 | [1] | 3,154.83 |
| 1984 | 1,066,763.88 | 533,381.94 | [1] | 266,691.47 |

[1] 50 percent of the interest due on the deficiency.

The increases to the deficiencies in and additions to tax are based upon respondent's claim that petitioner fraudulently, and with the intent to evade tax, failed to report income in the additional amounts of $128,860.71, $25,237.66, and $2,133,528.76 on his 1982, 1983, and 1984 returns, respectively. Therefore, the total deficiencies in and additions to tax in dispute with respect to docket No. 5766-90 are as follows:

| | | Additions to Tax | | |
| Year | Deficiency | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6661 |
|------|-----------|-----------------|-----------------|-----------|
| 1982 | $393,679.86 | $196,839.93 | [1] | $98,419.97 |
| 1983 | 1,338,683.33 | 669,341.67 | [1] | 334,670.83 |
| 1984 | 1,386,577.88 | 693,288.94 | [1] | 346,644.47 |

[1] 50 percent of the interest due on the deficiency

---

[2] Respondent, in a second notice of deficiency dated Apr. 9, 1991, determined additions to tax under secs. 6653(b)(1) and (2) and 6661 against petitioner Helen R. DeSantis. A timely petition was filed at docket No. 13108-91. Respondent conceded the adjustments in this notice of deficiency.

The adjustments raised by respondent in the notice of deficiency, answer, and amendment to answer are as follows:

| | Tax Years Ended | | |
|---|---|---|---|
| Adjustments to Income | 1982 | 1983 | 1984 |
| a. Partnership fee income | $624,000.00 | $1,017,900.00 | $291,700.00 |
| ADJ/Bethel Woods, Ltd. | -0- | 153,900.00 | -0- |
| ADJ/Bethel Woods, Ltd. | -0- | 3,222.00 | -0- |
| b. Newtowne | [1]31,014.00 | 1,282,500.00 | -0- |
| Park Place | -0- | -0- | 180,000.00 |
| Saltergate I | 120,000.00 | -0- | -0- |
| Cost savings | -0- | 106,037.66 | 202,028.76 |
| Architectural fee | -0- | -0- | 30,000.00 |
| Ford Van | 8,860.71 | -0- | -0- |
| c. Savko | -0- | 124,330.00 | 34,000.00 |
| d. Interest | -0- | (10,524.00) | -0- |
| e. Schedule C | | | |
| Oil & gas exploration | 3,484.00 | -0- | -0- |
| Uncollectible operating expense | -0- | -0- | 2,516,224.00 |
| Gross receipts | -0- | -0- | (480,800.00) |
| Total | 787,358.71 | 2,677,365.66 | 2,773,152.76 |

[1] This amount reflects the difference between $158,000, as determined by respondent in the notice of deficiency, and $126,986, as reported on petitioner's 1982 return.

After concessions,[3] the issues for decision are: (1) Whether petitioner failed to report income he received from several partnerships on his 1982, 1983, and 1984 Federal income tax returns; (2) whether petitioner received income from Newtowne, Inc., which was not reported by petitioner on his 1982,

---

[3] Respondent concedes the following issues raised in the notices of deficiency and amendment to answer: (1) An increase in taxable income for 1984 in the amount of $34,000 identified in the amendment to answer as "a kickback from Savko"; (2) $1,060.71 of the Ford Van income raised in the amendment to answer for 1982; (3) $1,371.02 of the cost savings adjustment raised in the amendment to answer for 1984; and (4) the addition to tax for fraud under sec. 6653(b)(2) on that portion of the deficiencies attributable to:

| Year | Adjustment | Amount |
|---|---|---|
| 1982 | Schedule C - Oil and gas exploration | $3,484 |
| 1983 | Partnership fee income (AJD/Development. Co.) | 65,650 |
| 1983 | Partnership fee income (Savko) | 124,330 |
| 1983 | Partnership fee income (AJD/Bethel Woods, Ltd.) | 3,222 |

1983, and 1984 returns; (3) whether petitioner received $124,330 in income from Savko which was not reported on his 1983 return; (4) whether petitioner is entitled to claim a deduction for windfall profits tax withheld in the amount of $3,484 on his 1982 return; (5) whether petitioner is entitled to claim a bad debt deduction in the amount of $2,516,224 on his 1984 return; (6) whether respondent erroneously decreased reported 1984 income by $1,933,600, as determined in the notice of deficiency, and whether the proper decrease of reported income is $480,800, as claimed by respondent in her amended answer; (7) whether petitioner is liable for the additions to tax for fraud pursuant to section 6653(b)(1) and (2) for the tax years ended 1982, 1983, and 1984; and (8) whether petitioner is liable for the additions to tax for substantial understatement of income tax for 1981, 1982 and 1983 under section 6661.

Procedural Background

These cases have a long history. The petition in docket No. 5766-90 was filed in March 1990. The first notice of trial was issued in June 1991 setting this matter for trial in November 1991. The matter was continued based on a joint motion by the parties. During 1992 through 1994, the matter was continued three more times. In August 1993, we granted Aaron P. Rosenfeld's and George N. Corey's motion to withdraw as counsel for petitioner Albert J. DeSantis. When the matter was continued

in January 1994, the parties represented that they believed they might settle the case or at least narrow the issues. The cases were specially assigned in November 1994, and in December 1994 the cases were set for trial in May 1995. During the period between December 1994 and May 1995, extensive motions were filed by respondent seeking to compel discovery as well as seeking to enforce stipulation under Rule 91(f). The Court held hearings on some of the motions and issued appropriate orders.

On the eve of the scheduled May 8, 1995, trial (May 5, 1995), the Court received copies of documents from petitioner indicating his unavailability for trial. The documents consisted of notes from doctors indicating that petitioner was suffering from vertigo and imbalance. The Court attempted to schedule a conference call; however, petitioner advised a representative of the Court that he was unwilling to engage in a conference call.

The matter was called for trial in Columbus, Ohio, on May 8, 1995. Petitioner did not appear. The Court filed the documents previously received on May 5, 1995, as petitioner's motion to continue. Respondent presented Dr. Hurlbutt as a witness so that the Court could get a sense of petitioner's medical condition. Dr. Hurlbutt was the attending physician in the emergency room where petitioner sought treatment. Dr. Hurlbutt testified that petitioner complained of vertigo; however, there were no

objective physical symptoms of the condition such as nystagmus.[4] Dr. Hurlbutt indicated that he originally wrote on a prescription that petitioner should remain out of work for 1 week; however, petitioner asked that the prescription be more specific and coincide with a prescription for an episode that occurred a few years earlier. As a result, Dr. Hurlbutt rewrote the prescription suggesting 2 weeks of minimal activity. After hearing Dr. Hurlbutt's testimony, respondent indicated that she did not object to a continuance and asked that the cases be set for trial in a few weeks. On the basis of the record, the Court granted the motion to continue. The Court expressed its concern at the continued delay of this matter and advised that it would reset the cases for trial in the near future. The Court's order dated May 8, 1995, directed petitioner to review the transcript of the May 8, 1995, proceeding and further indicated that the Court would be inclined to deny any further requests for a continuance.

By order served May 30, 1995, the Court set the cases for trial on July 31, 1995. The order, among other things, pointed out that the Court attempted on a number of occasions after May 5, 1995, to arrange conference calls with the parties. Petitioner advised representatives of the Court on more than one

---

[4] Nystagmus is a quick oscillation of the eyes that often is noted in patients who suffer vertigo.

occasion of his unwillingness to engage in a conference call.[5]
The Court further reiterated that it would not be inclined to
grant any further continuances.  On June 23 and 28, 1995, the
Court issued orders respectively relating to respondent's motion
to show cause why proposed facts and evidence should not be
accepted as established, Rule 91(f), and respondent's motion in
limine.  The Court had previously issued an order sanctioning
petitioner for failure to respond to respondent's discovery.  The
Court also deemed certain facts and evidence stipulated based on
the record.

On July 24, 1995, a week before the scheduled trial,
petitioner filed a motion to continue.  Petitioner asserted that
he continued to suffer from dizziness.  The Court denied the
motion to continue on July 26, 1995, and conducted a conference
call with the parties.  Petitioner advised that he would not
appear at the trial scheduled for July 31, 1995.  Respondent
advised that she would appear and present her case with respect
to those matters on which she had the burden of proof.  The Court
advised petitioner that the trial would proceed on July 31, 1995,
and that his failure to appear or his failure to have counsel
appear could have adverse consequences.

---

[5]  The Court sought to schedule conference calls to obtain
updates on petitioner's medical condition and coordinate the
scheduling of hearings and the trial.

When the case was called for trial at Columbus, Ohio, on July 31, 1995, petitioner did not appear for trial. Respondent presented Dr. Kelly Lee Mckeraham, a physician at the Ohio State University family practice clinic. Dr. Mckeraham did not examine petitioner, nor was he able to express an opinion as to whether petitioner's medical condition was so severe as to prevent him from appearing in Court. At petitioner's request and based on petitioner's medical file, Dr. Mckeraham provided a note for petitioner excusing him from upcoming business meetings.

On the basis of the record, the Court concluded that the matter should proceed to trial despite petitioner's absence. The Court was far from satisfied that petitioner's failure to appear was based on his medical condition rather than his desire to further delay the trial. The record in this case revealed a history of delay and failure to communicate and cooperate. The Court simply could not tolerate any further delay tactics by petitioner. The Court also notes that there were substantial stipulations of fact and exhibits already in the record, some of which petitioner had agreed to and some of which were the result of orders issued under Rule 91(f). The Court issued an order providing the parties an opportunity to file briefs. In fact, petitioner did file a posttrial brief.

When this case was called for trial on July 31, 1995, respondent orally moved to dismiss this case for failure to

properly prosecute as to those issues on which petitioner bears the burden of proof.  At the conclusion of trial, respondent filed a written motion to dismiss for petitioner's failure to properly prosecute.  The Court took the motion under advisement. Since respondent bears the burden of proof with respect to the additions to tax for fraud, the increased deficiencies, and the additions to tax claimed in her amended answer, the case proceeded to trial wherein respondent presented her case.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.[6] The stipulation of facts and attached exhibits are incorporated herein by this reference.  At the time of filing the petition herein, petitioner resided in Columbus, Ohio.

1.  <u>General Background</u>

During the years at issue, petitioner was self-employed in various businesses relating to the development of residential real estate.  Petitioner has a bachelor of science degree from Miami University, with a major in accounting, and a master of business administration degree from Ohio State University, with a major in finance.  Petitioner has also completed a major portion

---

[6] A stipulation of facts was filed by the parties containing almost 500 paragraphs and hundreds of attached exhibits.  The Court also deemed certain facts and evidence stipulated pursuant to Rule 91(f).  Also, petitioner was sanctioned for failure to comply with discovery, in that he was prevented from presenting evidence of certain matters.  In any event, petitioner did not appear nor offer any evidence at trial.

of the work toward a doctoral degree in finance.  Petitioner has 10 years of part-time teaching experience in the areas of finance, business, and accounting.  Petitioner was associated with the Graduate School of Central Michigan University with teaching responsibility in the finance area for Central Michigan University/American Society of Medical Technologists' Business Program for 8 years.

On September 1, 1989, petitioner pled guilty to the willful making of false Federal income tax returns for the years 1982 and 1983, pursuant to section 7206(1).  Section 7206 provides in pertinent part:

Any person who--

(1) Declaration under penalties of perjury.--
Willfully makes and subscribes any return, statement,
or other document, which contains or is verified by a
written declaration that it is made under the penalties
of perjury, and which he does not believe to be true
and correct as to every material matter; * * *

\* \* \* \* \* \* \*

shall be guilty of a felony * * *

In a Sentencing Decision filed December 28, 1989, in the U.S. District Court for the Southern District of Ohio, the court stated:

It is agreed between the Government and Mr.
DeSantis that Mr. DeSantis' federal income tax returns
for the years 1982 and 1983 failed to include a
substantial amount of income, from one or more sources,
the amount of which is in dispute. * * *

The defendant stands before this Court as an apparently intelligent, hard driving business man who has succeeded in his chosen field. Unfortunately, the defendant for whatever reason, chose to commit perjury in the preparation and verification of his tax returns which means that they were not true and correct as to every material matter.

2.   The Partnerships

Petitioner organized over 100 general and limited partnerships (the partnerships) for the purpose of acquiring and developing property for his real estate activities in the northwest region of Columbus, Ohio. Petitioner was either the sole general partner or controlled the general partner in each partnership. DeSantis Associates, for example, was a general partnership in which DeSantis, Inc., was a general partner, and petitioner was the managing partner. The stock of DeSantis, Inc., was owned solely by petitioner. Each partnership had a separate bank account with BancOhio National Bank (BancOhio) in Columbus, Ohio. Petitioner also maintained a personal checking account, No. 830536146, with BancOhio.

Petitioner, as general partner, entered into separate written contracts with the partnerships in which he agreed to provide the latter with financial and consulting services. Specifically, the contracts were entitled "Ongoing Financial and Tax Analysis, and Investment Counseling Agreements". Petitioner, as the general partner of the partnerships, signed the agreement on behalf of the parties. Petitioner agreed to perform the

financial services for a set fee.  The partnerships paid
petitioner in accordance with the agreements.  The partnerships
deducted the fees on their income tax returns as the cost of
services provided by petitioner.

From 1981 through 1990, John Meeks (Meeks), a certified
accountant, assisted in the preparation of petitioner's
individual income tax returns and Forms 1065 for most of the
partnerships.  Petitioner gave Meeks photocopies of returns which
were completed in pencil.  Meeks reviewed the photocopies for
mathematical errors and forwarded them to petitioner.  Petitioner
typed the corrected information on the returns and Meeks reviewed
this information before petitioner mailed the returns to the IRS.
Meeks did not ask petitioner for documentation verifying the
amounts reflected on any of petitioner's returns.

The record reflects that petitioner received the following
amounts from partnerships which he controlled:

<u>1982</u>

<u>Partnership</u>

AJD/Bethel Colony II
AJD/Chillowick
AJD/Olde Sawmill on the Lake II
AJD/Olde Sawmill on the Lake
AJD/Rivergreen
Bethel Colony, Buildings 1--10
Bethel Office Buildings 5 & 7
Brafferton, Buildings 19, 29, 30, & 31
Brafferton Village Associates
Saltergate, Buildings 1--10
Saltergate II, Buildings 1--9
Woodbridge Buildings 10--15
Mobile Office Building

Total received

### 1983

| Partnership | Amount |
| --- | --- |
| JD/Dierker Rd., Ltd. | $96,000 |
| AJD/Robin Woods, Ltd. | 80,900 |
| Bethel Office Buildings 1, 2, 5--7 | 60,000 |
| Brafferton Buildings 19 & 30 | 13,600 |
| Rivergreen Buildings 1--10 | 135,000 |
| AJD Development/The 161 Company | 47,700 |
| Mobile Office Building | 6,000 |
| Olde Sawmill on the Lake Buildings 1--8 | 128,900 |
| Olde Sawmill on the Lake II, Buildings 1--6 & 9 | 106,600 |
| AJD/Bethel Woods | 153,900 |
| Total received | 828,600 |
| Less concession | (12,000) |
| Total | 816,600 |

### 1984

| Partnership | Amount | Amount Previously Reported | Co |
| --- | --- | --- | --- |
| AJD Development/The 161 Company | $192,750 | $54,050 | |
| AJD/Robin Woods | 215,900 | 63,000 | $ |
| Total received | 408,650 | | |
| Less concession | (17,900) | | |
| Less amount previously reported | (117,050) | | |
| Total | 273,700 | | |

Petitioner does not contest respondent's claim that he received payments from the partnerships during the years in issue. Petitioner asserts that the payments were either: (1) Repayments to petitioner of loans allegedly made to the partnerships; (2) nontaxable partnership withdrawals by petitioner which are properly chargeable to his capital accounts; or (3) loans to petitioner from the partnerships.

Petitioner recorded his transactions with each partnership on a ledger (the ledger). Respondent introduced into evidence a computer spreadsheet outlining those transactions, which utilized the ledger. Petitioner also recorded certain financial information concerning petitioner and the partnerships on several documents entitled "GAP loan interest payments" (GAP sheets). The GAP sheets purport to record short-term loans from petitioner to the partnerships. The amounts and dates of payment reflected on the GAP sheets are virtually identical to the entries listed on the ledgers. The only difference is the manner in which certain of the payments are recorded. On the GAP sheets, these payments are recorded as loans from petitioner to the partnerships. On the ledgers, they are recorded as miscellaneous draws from the partnerships. The ledgers do not reflect loans from petitioner to the partnerships in the amounts and on the dates indicated on the GAP sheets. Apart from the GAP sheets, there is no evidence in the record that petitioner lent money or otherwise transferred funds to the partnerships during the years at issue. Some of the ledgers reflect negative balances at the close of the year.

The limited partnerships' offering circulars specifically state: "No loans of any type or description shall be made or given to the General Partner, its constituent partners or its affiliates". The offering circulars did permit petitioner, as

general partner, to make short-term or GAP loans to the limited partnerships at an interest rate of 2 percent above the prime rate. The GAP sheets purport to record that petitioner made such loans and that the limited partnerships paid interest to petitioner. The record does not reflect that the limited partnerships made payments of principal to petitioner.

Petitioner caused checks to be issued from the partnerships payable to himself, bearing the notation "second mortgage interest". The second mortgage interest is attributable to second mortgage loans purportedly made by petitioner to the partnerships. The record does not reflect the terms of any second mortgage loans. Furthermore, there is no evidence that petitioner transferred any funds to the partnerships in accordance with the purported second mortgage loans.

Petitioner also caused the partnerships to pool funds to purchase jumbo certificates of deposit during the years at issue. A jumbo certificate of deposit is a certificate of deposit in the amount of $100,000 or more.

Petitioner owned rental properties in the Ohio State University and other Columbus, Ohio, areas. During the years in issue, petitioner owned from 31 to 79 such rental properties. Petitioner hired several independent contractors (the laborers) to clean and repair the rental units. Petitioner would present the laborers with their weekly paychecks which they, in turn,

would endorse back to petitioner. Petitioner would give the laborers cash in return for the checks. The checks were drawn on different partnership accounts and were often left blank in amount. Petitioner instructed his secretary to write a specified dollar amount on the front of the checks that exceeded the amount of cash paid to laborers. The checks were cashed on the following day at BancOhio. Petitioner had an arrangement with BancOhio whereby the checks could be cashed without his endorsement.

Some of the checks drawn on the partnership accounts were for services that were not performed by the persons who endorsed the checks. For example, the record reflects notations on several checks for "cleaning" services. The record further reflects that these checks were actually yearend bonuses paid to petitioner's secretaries. Some of the checks were in payment of petitioner's personal expenditures. For example, petitioner caused checks to be drawn from his partnership accounts to pay for supplies for his Arabian horses. The checks, however, reflect that payment was made for "duck feed" for a duck pond on one of the partnership's properties.

The inflated checks written on partnership accounts and other payments made from partnership accounts for personal expenditures are part of the basis of the increased partnership income determined by respondent and not disputed by petitioner.

3.  Newtowne, Inc., and Related Transactions

Newtowne, Inc. (Newtowne), an Ohio corporation founded in 1972, was the construction company which served as petitioner's general contractor for most of his real estate projects.  Phillip Fankhauser (Fankhauser), William Riat (Riat), Steven Branam (Branam), and Frederick Forster (Forster) were officers and shareholders of Newtowne.  Fankhauser served as Newtowne's president during the years in issue.  In 1992, Newtowne filed a chapter 11 petition in bankruptcy.  During the years in issue, Newtowne was desperate for business from petitioner and, thus, acceded to many of petitioner's wishes and demands.  As a result of the lack of arm's-length dealing, petitioner was able to manipulate many of the transactions with Newtowne to his benefit.

Newtowne entered into contracts with the partnerships to provide the latter with construction and design services. Newtowne also entered into several "Market Research Analysis and Ongoing Planning [Agreements]" and "Warranty Service [Agreements]" with the partnerships.  With the exception of two contracts, petitioner signed the contracts on behalf of both parties.

Petitioner advised representatives of Newtowne that he did not expect to receive the services set forth in the market research and warranty agreements.  Petitioner sent messengers to Newtowne's office with checks that were drawn on various

partnership accounts and bore the following preprinted endorsement: "Pay to the Order of Albert J. DeSantis in Partial Payment of Consulting Services." The messengers were instructed to wait for Fankhauser to endorse the checks before returning to petitioner. The messengers returned the endorsed checks to petitioner who deposited the checks into account No. 830536146 at BancOhio.

So-called Ongoing Financial & Tax Analysis & Investment Counseling Agreements reflect that funds were drawn on various partnership accounts, and were made payable to petitioner as follows:

### 1982

| Partnership | Amount | Concession |
|-------------|--------|------------|
| AJD/Bethel Colony II, Building 1 | $15,000 | |
| AJD/Bethel Colony II, Building 2 | 10,000 | |
| AJD/Bethel Colony II, Building 3 | 15,000 | |
| AJD/Bethel Colony II, Building 4 | 10,000 | |
| AJD/Bethel Colony II, Building 5 | 15,000 | |
| AJD/Bethel Colony II, Building 6 | 10,000 | |
| AJD/Bethel Colony II, Building 7 | 15,000 | |
| AJD/Bethel Colony II, Building 8 | 10,000 | |
| AJD/Bethel Colony II, Building 9 | 15,000 | |
| AJD/Bethel Colony II, Building 10 | 10,000 | |
| AJD/Bethel Colony II, Building 11 | 15,000 | |
| AJD/Bethel Colony II, Building 12 | 10,000 | |
| Bethel Office, Building 7 | 12,000 | $4,000 |
| Total received | 162,000 | |
| Less concession | (4,000) | |
| Total | 158,000 | |

## 1983

| Partnership | Date | Check Deposit Date | Amount | |
|---|---|---|---|---|
| AJD/Bethel Colony II | 12/31/82 | 1/3/83 | $150,000 | |
| AJD/Olde Sawmill on the Lake | 12/31/82 | 1/3/83 | 126,000 | |
| AJD/Olde Sawmill on the Lake II | 12/31/82 | 1/3/83 | 144,000 | |
| AJD/Rivergreen | 12/31/82 | 1/3/83 | 171,000 | |
| Saltergate II | 1/25/83 | 1/27/83 | 120,000 | |
| AJD/Dierker Rd. | 6/15/83 | 6/23/83 | 184,000 | |
| Bethel Colony II | 8/16/83 | 8/16/83 | 150,000 | |
| Rivergreen | 11/8/83 | 11/14/83 | 142,500 | |
| OSOTL | 11/8/83 | 11/14/83 | 115,000 | |
| OSOTLII | 11/8/83 | 11/14/83 | 120,000 | |
| Total | | | 1,422,500 | |
| Less concessions | | | (150,000) | |
| Total | | | 1,272,500 | |

## 1984

| Partnership | Date | Amount |
|---|---|---|
| Park Place | 10/15/84 | $18,000 |
| Park Place | 10/15/84 | 18,000 |
| Park Place | 10/15/84 | 18,000 |
| Park Place | 10/15/84 | 18,000 |
| Park Place | 10/15/84 | 108,000 |
| Total | | 180,000 |

In the preparation of petitioner's Federal income tax returns, Meeks did not determine whether the checks from Newtowne that were endorsed to petitioner, some of which were deducted on the partnerships' returns, were included in petitioner's income.

Meeks did not examine the endorsements written on the back of the checks.

Petitioner failed to attach a schedule to his 1982 or 1983 return indicating how he determined gross receipts from his financial consulting activity. Petitioner attached a schedule to his 1984 return which itemized the income he received from financial consulting for that year. The attached schedule does not reflect that petitioner received $180,000 from Park Place. Rather, the schedule reflects that petitioner received $30,525 from Park Place and $180,000 in "other consulting fees", without indicating what "other consulting fees" represents.

After the completion of a project known as Bethel Colony I, petitioner signed all contracts on behalf of the partnerships and negotiated with subcontractors, while Newtowne did most of the estimating and bidding for the projects. Petitioner required that Newtowne use Reno Morine, a cement contractor, and Nicholas Savko & Sons (Savko) for excavation and site preparation services. Petitioner threatened the employees of Newtowne so that they would comply with his demands. For example, at one of petitioner's meetings with the employees of Newtowne, petitioner posted the following message:

> Your business is at stake. Your homes are at stake. Your reputation is at stake. Your livelihood is at stake. I want performance not damn excuses or <u>I will go elsewhere</u>, and if you don't like it, you are welcome to go elsewhere.

At the bottom of the message, Riat wrote "And so we did". Petitioner's manipulation of Newtowne enabled him to obtain personal benefits that he would not have been able to enjoy under an ordinary business relationship.  Through his intimidation tactics, petitioner was able to reap the benefits from "cost savings", the purchase of two office buildings at a reduced cost, the construction of his personal residence, and a Ford van, infra.

    (a)  Cost Savings (Including Park Place)

Before obtaining financing for a given project, Newtowne would prepare a detailed budget estimating specific costs allocated to specific line items in the budget.  Any funds remaining upon the completion of the project were known internally as "cost savings".  Cost savings were determined on a line-by-line basis for each item of the project by comparing the estimated cost to the actual cost.  Petitioner and Newtowne entered into an agreement whereby petitioner would receive 100 percent of the cost savings for certain items of the budget, Newtowne would receive 100 percent for other items, and the cost savings from the remaining items would be split equally.  The checks Newtowne received for cost savings were often endorsed over to petitioner.

Petitioner applied a portion of the cost savings towards the construction cost of his home. The amounts of the cost savings from each construction project that were applied by Newtowne to petitioner's construction account in 1983 and 1984 as follows:

### 1983

| Partnership | Check Date | Amount |
|---|---|---|
| Saltergate I | 2/23/83 | $10,842.54 |
| Saltergate II | 6/30/83 | 42,942.03 |
| Bethel Colony II | 11/01/83 | 31,756.51 |
| Owner's Check Request[1] | 8/31/83 | 20,496.58 |
| Total | | 106,037.66 |

[1] See discussion infra.

### 1984

| Partnership | Date | Amount |
|---|---|---|
| Bethel Colony II/Park Place | 2/84 | $2,324.04 |
| Bethel Woods | 8/84 | 9,000.00 |
| Park Place | 7/84 | 9,457.15 |
| OSOTL | 7/84 | 10,686.61 |
| Bethel Woods | 7/84 | 13,300.00 |
| Park Place | 6/84 | 5,475.00 |
| OSOTL | 6/84 | 15,986.81 |
| Park Place | 5/84 | 15,000.00 |
| Park Place/SAVKO | 4/84 | [1]28,000.00 |
| OSOTL | 4/84 | 19,000.00 |
| Park Place | 4/84 | 9,671.40 |
| OSOTL | 3/84 | 24,499.98 |
| OSOTL | 3/84 | 15,000.00 |
| Rivergreen | 1/84 | 13,256.70 |
| Park Place | 12/83 | 10,000.00 |
| Total | | 200,657.69 |

[1] See discussion entitled "Construction of Petitioner's Home", infra.

Distributions from particular line items in the construction budgets were also made to petitioner before cost savings were computed. Such distributions were known internally as "owner's check request(s)". On August 31, 1983, for example, an owner's check request was issued to petitioner from Newtowne in the amount of $20,496.58. This amount is not reflected on petitioner's 1983 return. Petitioner failed to attach to that return a schedule indicating how he determined his gross receipts for 1983. Petitioner prepared a document entitled "1099 Income" which purports to reflect amounts he received during 1983 for his financial consulting services. This document was not presented to Meeks when he reviewed petitioner's return for that year. The owner's check request is not reflected on this document.

Petitioner's 1984 return does not reflect the amounts he received from Newtowne in cost savings. As indicated, petitioner attached a schedule to his 1984 return which itemized the income he received from "Financial Consulting". The schedule does not state that he received payments from Newtowne. Petitioner reported "other consulting fees" on the schedule in the amount of $180,000. It is unclear whether "other consulting fees" represents the amounts petitioner received from Newtowne for his consulting services, cost savings, or a portion of the cost

associated with Newtowne's construction of petitioner's home, infra.

Meeks was not aware that petitioner received cost savings from Newtowne when he assisted in the preparation of petitioner's 1984 return. Meeks was also not aware that Newtowne acted as the general contractor for the construction of petitioner's home.

(b) Saltergate I

On July 30, 1982, petitioner, acting as general partner of two limited partnerships, purchased two office buildings from Newtowne for $430,000 and $50,000, respectively. The limited partnerships participated in a real estate construction project known as Saltergate Village Phase I. Petitioner received credits for syndication and consulting fees from Newtowne in the amounts of $110,000 and $10,000, respectively, which were applied to the purchase price of the office buildings. The $120,000 in credits petitioner received was not reported as income on his 1982 return.

On December 1, 1982, petitioner caused the two limited partnerships to enter into separate "Market Research Analysis and Ongoing Planning [Agreements]" with Newtowne. The agreements were signed on behalf of both parties by petitioner. On July 30, 1982, petitioner caused checks to be drawn on the accounts of the

limited partnerships totaling $120,000 payable to Newtowne. Petitioner caused the checks to bear a notation indicating that payment was for warranty and/or market research fees. The partnerships did not owe Newtowne any amounts for warranty and/or market research fees in 1982. The checks were endorsed to the Huntington Mortgage Co. and deposited into an account entitled "Newtowne III" at Huntington Bank. These checks represent the amounts referred to above as syndication and consulting fees. Huntington Bank issued a loan commitment letter to petitioner setting forth the provisions of loans in the amount of $320,000 for the purchase of the two office buildings.

(c) Construction of Petitioner's Home and Architectural Services

As a condition to signing one of the contracts between a partnership that petitioner controlled and Newtowne, petitioner approached Riat with the prospect of swapping petitioner's home for Riat's home. Instead of swapping homes, Riat suggested that he design and build, with Newtowne, a 10,000-square-foot home for petitioner. The parties entered into a contract to build the home in November 1983, and construction began shortly thereafter.

On February 28, 1985, Newtowne and petitioner entered into a separation agreement. The construction of the home was not completed at the time Newtowne entered into the separation

agreement. Newtowne was never compensated for its services as a general contractor, which are estimated at $100,000. Riat received $5,000 from petitioner for the architectural services he provided that had a value of approximately $35,000. Petitioner failed to report on his 1984 return the $30,000 difference between the value of Riat's services, $35,000, and the amount he actually paid, $5,000. Newtowne's cost of constructing the home, not taking into account any credits for petitioner's consulting services, was $361,055. The cost of constructing petitioner's home and the value of the contractor services provided by Newtowne were not reported as income on petitioner's 1984 return.

As indicated earlier, Savko was the excavation and site preparation firm that performed most of the excavation work for petitioner. Petitioner obtained a construction loan account for four of his projects at Chicago Title Insurance Co. (Chicago Title). Specific amounts of construction loan funds in the Chicago Title account were budgeted to cover specific costs. During the construction of petitioner's home, petitioner drew on this construction loan account to pay Newtowne and Savko for their services. Savko endorsed the checks it received from Chicago Title to Newtowne in payment of the costs associated with the construction of petitioner's home. For example, on April 13,

1984, Chicago Title issued a check in the amount of $28,000 payable to Savko and petitioner. The check was endorsed by Savko and petitioner and made payable to Newtowne on April 17, 1984. The $28,000 was applied to petitioner's construction account at Newtowne. Petitioner failed to report this amount as income on his 1984 return.

Branam served as treasurer of Newtowne from May 1982 to September 1988. When Branam first received the check drawn on the Chicago Title account, he questioned why it should be applied to petitioner's construction account. Savko indicated that the check was in partial payment of petitioner's consulting services. Upon receiving this information, Branam credited this check to petitioner's account.

The total amount of credits applied to petitioner's construction account was not reported on his 1983 and 1984 returns. As indicated above, Meeks was unaware that petitioner was subsidizing the construction of his home with his purported financial consulting services through Newtowne and Savko.

(d) <u>The Ford Van</u>

In 1982, Newtowne was working on the first phase in a real estate project, the Saltergate Village project, with one of the partnerships. Forster, who was vice president of Newtowne during

the years at issue, was the superintendent in charge of the Saltergate Village project.

Petitioner informed the other owners of Newtowne that he did not want Forster working on the project. Petitioner indicated that if Forster continued working on the project, he would terminate the contract between the partnerships and Newtowne. The parties finally agreed that Forster could remain on the project if he purchased a Ford van for petitioner. Petitioner also indicated that Forster could not write a company check for this purchase. Instead, petitioner wanted Forster to pay for this van using funds from his personal checking account.

In accordance with petitioner's instructions, Forster presented petitioner with a check for $7,800 payable to a Ford dealership. Petitioner invited his secretaries and other employees into his office to witness the exchange. As Forster handed him the check, petitioner announced: "I want to thank you for this gift". Forster remained on the Saltergate Village project, and Newtowne reimbursed him for the $7,800. Petitioner did not report receipt of this van on his 1982 return.

4. Unreported Income From Savko

Respondent determined in the notice of deficiency that petitioner failed to report $124,330 and $34,000 in income he

received from Savko on his 1983 and 1984 returns, respectively. Respondent conceded $34,000 of income from Savko with respect to 1984.

5.    Schedule C Oil and Gas income

One of the Schedules C of petitioner's 1982 return reflects that petitioner, doing business as "Albert J. DeSantis", engaged in "Oil & Gas Exploration".  Petitioner claimed a deduction for windfall profits tax withheld in 1982 in the amount of $3,484. In the notice of deficiency, respondent disallowed the deduction of windfall profits tax withheld in 1982 and increased petitioner's 1982 taxable income by $3,484.

6.    Uncollectible Operating Expenses

On Schedule C of his 1984 return, petitioner reported $2,742,409 in gross receipts or sales.  Petitioner also claimed a bad debt deduction in the amount of $2,516,224, attributable to his financial consulting activity, as "Uncollectible operating advances".  Meeks advised petitioner that in order to claim the bad debt deduction, petitioner was required to file amended partnership returns to reflect this discharge of indebtedness income.  Petitioner did not heed this advice despite Meeks' insistence on making these changes.  The only partnership that reported discharge of indebtedness income during 1984 was Bethel

Colony II, Building 9, Ltd.  Petitioner deducted $28,000 for worthless debts owed him by that partnership on his 1984 return.

In the notice of deficiency, respondent disallowed the claimed bad debt.  Also in the notice of deficiency, respondent decreased reported income by $1,933,600.  The basis for the adjustment was that petitioner incorrectly reported fee income in 1984 that should have been reported in other years.  In the amendment to answer and on brief, however, respondent asserts that reported income for 1984 should have been reduced by $480,800, rather than the $1,933,600 determined in the notice of deficiency.  Therefore, as a result of her amendment to answer, respondent's claimed adjustment with respect to Schedule C of the 1984 return is $2,035,424, rather than $582,624 as originally determined.

In her amendment to answer, respondent reduced the 1984 reported consulting fee income by $480,800 and specifically identified the amounts of payments from named partnerships controlled by petitioner.  The following fee income was reported on the 1984 return; however, respondent contends that it properly belongs on the 1982 and 1983 returns and was so determined in the notice of deficiency:

| | |
|---|---|
| AJD/Robin Woods, Ltd. | $63,000 |
| Rivergreen Buildings 1--10 | 135,000 |
| Brafferton Buildings 30 and 31 | 20,000 |
| Olde Sawmill on the Lake Buildings 1--8 | 128,100 |
| Old Sawmill on the Lake II Buildings 1--9 | 134,700 |
| Total | 480,800 |

7.  The Tax Returns

Petitioners filed joint Federal income tax returns for the taxable years 1982, 1983, and 1984.  Schedules C of these returns reflect that petitioner, doing business as "Albert J. DeSantis", engaged in "Financial Consulting".  On Schedule C of his 1982 return, petitioner reported $361,222 in gross receipts or sales. On Schedule C of his 1983 return, petitioner reported $470,806 in gross receipts or sales.  Petitioner did not indicate on the 1982 and 1983 returns what specific items of income represented the gross receipts.  There is no explanation as to how petitioner calculated gross receipts on Schedules C of his 1982 and 1983 returns.  On Schedule C of his 1984 return, petitioner reported $2,742,409 in gross receipts or sales.  Petitioner attached a schedule which itemized the income he received from "Financial Consulting" in 1984.  There is an entry on the schedule for "other consulting fees" in the amount of $180,000.  As indicated, petitioner did not provide an explanation of what fees he received and how he calculated this amount.

8.  Petitioners' Bankruptcy

After submission of these cases, petitioners filed a petition for bankruptcy on July 17, 1996.  By order of the bankruptcy court dated October 4, 1996, the stay was lifted, permitting the Tax Court to proceed in this matter.

OPINION

1.  Dismissal

With respect to the deficiencies determined in the notice of deficiency, respondent moved to dismiss these cases for petitioner's failure properly to prosecute.  The primary basis of the motion is that petitioner failed to appear at the scheduled trial of this case.  Respondent's motion to dismiss was limited to the deficiencies determined by respondent in the notice of deficiency upon which petitioner bears the burden of proof.  Rule 142(a).  We took this motion under advisement.  Because we find, based on the extensive record, that petitioner has failed to carry his burden of proof, we will deny respondent's motion as moot.

2.  Burden of Proof

As we have indicated with respect to the deficiencies determined in the notice of deficiency, petitioner bears the burden of proving that those determinations are erroneous.  Rule

142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). With respect to the increased deficiencies asserted by respondent in her amended answer, respondent bears the burden of proof. Rule 142(a); <u>Achiro v. Commissioner</u>, 77 T.C. 881, 889-890 (1981).

With respect to the additions to tax for fraud under section 6653(b)(1) and (2), respondent bears the burden of proving fraud by clear and convincing evidence. Rule 142(b). In order to establish petitioner's liability for fraud under section 6653(b)(1), respondent bears the burden of proving by clear and convincing evidence that: (1) An underpayment of tax exists for each of the years in issue, and (2) some portion of the underpayment is due to fraud. Sec. 7454(a); Rule 142(b); <u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 698-699 (1989); <u>Hebrank v. Commissioner</u>, 81 T.C. 640, 642 (1983). To meet this burden, respondent must show that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead or otherwise prevent the collection of such taxes. <u>Rowlee v. Commissioner</u>, 80 T.C. 1111, 1123 (1983). For purposes of section 6653(b)(2), respondent must also prove the portion of the underpayment attributable to fraud. Sec. 6653(b)(2); <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992).

3.  The Deficiencies

(a)  Unreported Income From the Partnerships

In the notice of deficiency, respondent determined that petitioner failed to report fee income in the amounts of $624,000, $1,252,600, and $57,000 on his 1982, 1983, and 1984 returns, respectively.  Respondent also determined that petitioner had overstated his 1983 interest income by $10,524 and decreased that item accordingly.  Respondent further determined that petitioner's distributive share of partnership loss from ADJ/Bethel Woods, Ltd., for 1983 was $56, and not $3,278 as reported on petitioner's return.  Since these matters were determined in the notice of deficiency, petitioner bears the burden of proof.

In her amendment to answer, respondent decreased her determination with respect to petitioner's 1983 partnership fee income by $234,700, and increased her determination with respect to 1984 partnership fee income by an equal amount.  Respondent also asserts that petitioner failed to report additional partnership fee income in the amount of $153,900 in 1983. Respondent bears the burden of proof with respect to the increased deficiencies.  Rule 142(a).

Petitioner does not dispute that he received payments in the amounts determined by respondent for the years in issue. In any event, respondent presented substantial evidence that petitioner received such payments (with slight modifications as found by the Court). Petitioner contends that such payments were not partnership fee income but were either: (1) Repayments of loans from the partnerships to petitioner; (2) nontaxable partnership withdrawals by petitioner chargeable to the capital accounts; or (3) loans to petitioner from the partnerships. We will now consider these arguments.

Section 707(a) provides that, if a partner engages in a transaction with a partnership other than as a partner, the transaction shall, except as otherwise provided, be treated as occurring between the partnership and one who is not a partner. Section 707(c) provides that payments to a partner for services or the use of capital, if fixed without regard to the income of a partnership, are to be considered as made to one who is not a member of the partnership, but only for the purposes of including such amounts in the recipient's gross income and allowing a business expense deduction to the partnership. Specifically, section 707(c) provides:

> (c) Guaranteed Payments.--To the extent determined without regard to the income of the partnership,

payments to a partner for services  * * *  shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income), and, subject to section 263, for purposes of section 162(a) (relating to trade or business expenses).

Whether a partner is acting in his capacity as a partner while providing services to his partnership is a factual determination.  Falconer v. Commissioner, 40 T.C. 1011, 1015 (1963).  The regulations indicate:  "In all cases, the substance of the transaction will govern rather than its form."  Sec. 1.707-1(a), Income Tax Regs.  The inquiry under section 707(c) is whether the payments for petitioner's services were determined "without regard to the income of the partnership."  Falconer v. Commissioner, supra at 1016; see also sec. 1.707-1(c), Income Tax Regs.

We are satisfied that the facts of this case clearly place the payments made to petitioner pursuant to the "Ongoing Financial and Tax Analysis, and Investment Counseling [Agreements]", within the ambit of the term "guaranteed payments" pursuant to section 707(c).  Petitioner contracted with each partnership to provide the latter with financial consulting services for a fixed fee.  The fees were not dependent upon the profits of the partnerships.  Therefore, the fees were determined "without regard to the income of the [partnerships]."  Falconer

v. Commissioner, supra at 1016.  Accordingly, we find that the
payments to petitioner made in accordance with the partnership
agreements were guaranteed payments.

We now address petitioner's argument that the payments he
received are not income because they are repayments of loans from
petitioner to the partnerships.  Whether a transaction is a loan
for Federal income tax purposes is a question of fact.  The
following factors are considered in determining whether a loan is
bona fide:  (1) The existence of a sum certain; (2) the
likelihood of repayment; (3) a definite date of repayment; and
(4) the manner of repayment.  Seay v. Commissioner, T.C. Memo.
1992-254; Mangham v. Commissioner, T.C. Memo. 1980-280.

Petitioner's argument that the payments represent the
repayment of loans from petitioner to the partnerships is not
supported by the record.  As indicated, petitioner recorded the
transfer of funds to and from the partnerships on the ledgers.
The ledgers do not reflect that petitioner transferred funds to
the partnerships as reflected on his GAP sheets.  In addition,
there are no documents in the record, other than the GAP sheets,
setting forth the terms of the purported loans, terms of
repayment, collateral, etc.  Some of the ledgers reflect negative
yearend balances, indicating that petitioner withdrew more funds

than he transferred to the partnerships. Although the GAP sheets indicate that some interest payments were made to petitioner, there is no evidence of repayments of principal.[7]

We now address petitioner's second argument, that the payments are not income but are nontaxable distributions chargeable to his capital accounts. Section 731 provides that a partner recognizes gain to the extent that the amount of any money distributed exceeds the adjusted basis of the partner's interest in the partnership. Sec. 731(a). Section 1.731-1(a), Income Tax Regs., provides that this rule is applicable to current distributions and distributions in liquidation of a partner's entire interest in a partnership. Section 707 is not applicable to distributions of money or property by a partnership to a partner. Sec. 1.707-1(a), Income Tax Regs.

Since we have determined that the payments petitioner received are guaranteed payments within the purview of section 707(c), the payments are not distributions within the meaning of section 731. Therefore, petitioner's argument that the payments are chargeable to his capital accounts is without merit.

---

[7] If petitioner had lent funds to a partnership and was paid interest, such payment would, in any event, constitute income, whereas a return of principal would not constitute income.

Petitioner's final argument, that the payments represent loans from the partnerships to petitioner, is also without merit. There is no evidence in the record which indicates that such loans were made. In addition, the offering circulars for the limited partnerships clearly prohibit the making of such loans to petitioner, the general partner.

We hold that petitioner failed to report fee income in the total amounts of $624,000, $806,076,[8] and $273,700, on the 1982, 1983, and 1984 returns, respectively.

(b)  Unreported Income From Newtowne and Related Transactions

In the notice of deficiency, respondent determined that petitioner failed to report income he received from Newtowne in the amounts of $31,014 and $1,282,500 on his 1982 and 1983 returns, respectively. Petitioner has the burden of proof with respect to these adjustments.

In her amendment to answer, respondent claims that petitioner failed to report income he received from Newtowne and from transactions with Newtowne in the amounts of $8,860.71,

---

[8]  Calculated as follows:

| | |
|---|---|
| Amount received less concession | $816,600 |
| Less interest conceded | (10,524) |
| 1983 omitted fee income | 806,076 |

$106,037.66, and $232,028.76 on his 1982, 1983, and 1984 returns, respectively. Respondent concedes $1,060.71 and $1,371.02 of omitted income with respect to petitioner's 1982 and 1984 returns, respectively. Respondent also claims that petitioner failed to report income that he received through Newtowne from Saltergate I and Park Place in the amounts of $120,000 and $180,000 on his 1982 and 1984 returns, respectively. Respondent bears the burden of proof with respect to these claimed increased deficiencies. Rule 142(a).

Petitioner does not deny that he received the amounts as set forth in the findings herein. In any event, substantial evidence was presented which leads us to the conclusion that petitioner received the amounts of income claimed by respondent (as modified by the Court). Petitioner asserts that the payments from Newtowne originated with the partnerships and were either: (1) Repayments to petitioner of loans he made to the partnerships or (2) nontaxable partnership withdrawals.

We addressed petitioner's arguments in our discussion regarding the unreported partnership fee income supra. In holding that the payments petitioner received from the partnerships were income, we found that there was no evidence in the record which indicates that the amounts were: (1) Repayments

of loans from petitioner to the partnerships; (2) loans from the partnerships to petitioner; or (3) nontaxable partnership withdrawals. Since petitioner is advancing the same theories of nonincludability as he did with respect to payments he received from the partnerships, we see no need to reiterate our analysis herein. We hold that petitioner failed to report income from Newtowne and related transactions in the total amounts as follows:

<u>1982</u>

| | |
|---|---|
| Amount received | $162,000.00 |
| Ford van | 7,800.00 |
| Saltergate I | <u>120,000.00</u> |
| | 289,800.00 |
| Less amount reported | (126,986.00) |
| Less respondent's concession | <u>(4,000.00)</u> |
| Total | 158,814.00 |

<u>1983</u>

| | |
|---|---|
| Amount received | $1,422,500.00 |
| Cost savings | <u>106,037.66</u> |
| | 1,528,537.66 |
| Less respondent's concession | <u>(150,000.00)</u> |
| Total | 1,378,537.66 |

<u>1984</u>

| | |
|---|---|
| Cost savings | $174,028.76 |
| Park Place | 180,000.00 |
| Owner's check request | 28,000.00 |
| Riat's architectural services | 30,000.00 |
| Less amount reported with respect to Park Place | (30,525.00) |
| Less respondent's concession | <u>(1,371.02)</u> |

Total                                                    $380,132.74

(c)  Unreported Income From Savko and Schedule C Oil
and Gas Income

With respect to respondent's determination that petitioner received unreported income from Savko in 1983 and 1984, petitioner has not met his burden of proving that respondent's determination is erroneous.  No evidence or argument was presented that the amount petitioner received from Savko in 1983 or 1984 does not represent taxable income.  In addition, petitioner has not met his burden of proving that respondent's determination erroneously disallowed a deduction for windfall profits tax withheld in 1982, relating to petitioner's oil and gas exploration business.  Accordingly, respondent's determinations are sustained.

(d)  Uncollectible Operating Expenses in 1984 and the
Adjustment to Gross Receipts

As indicated, respondent's notice of deficiency determined that petitioner was not entitled to a claimed bad debt deduction in the amount of $2,516,224, purportedly attributable to "Uncollectible operating advances".  Petitioner, however, has failed to produce any evidence of loans related to the claimed bad debts.  Accordingly, we sustain respondent's determination.

In her amendment to answer, respondent asserted that gross receipts as reported by petitioner on the 1984 return should be reduced by $480,800 rather than $1,933,600 as originally determined by respondent. Petitioner presented no arguments or facts to dispute this assertion. Upon a review of this record, we are satisfied that respondent's claim in her amendment to answer is correct. Therefore, we sustain respondent's adjustment to petitioner's Schedule C income for 1984 in the amount of $2,035,424 ($2,516,224 less $480,800).

4. Additions to Tax (Section 6653(b)(1) and (2))

Respondent determined that petitioner is liable for additions to tax for fraud under section 6653(b)(1) and (2) for 1982, 1983, and 1984. As we previously indicated, respondent bears the burden of proving by clear and convincing evidence that there is an underpayment for each of the years in issue and that some portion of the underpayment is due to fraud. Sec. 6653(b)(1).

(a) Section 6653(b)(1)

We first consider the additions to tax under section 6653(b)(1). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published

opinion 578 F.2d 1383 (8th Cir. 1978).  Fraud may be proven by circumstantial evidence and reasonable inferences drawn from proven facts because direct proof of a taxpayer's intent is rarely available.  Spies v. United States, 317 U.S. 492, 499 (1943); Rowlee v. Commissioner, 80 T.C. 1111 (1983).  A taxpayer's entire course of conduct may establish the requisite fraudulent intent.  Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969).  The intent to conceal or mislead may be inferred from a pattern of conduct.  Spies v. United States, supra at 499.

Respondent has established, and we have held that there are, understatements of tax for 1982, 1983, and 1984.  Respondent has proven by clear and convincing evidence the existence of understatements of tax in all of the years at issue.  Having proved understatements of tax, respondent must also prove that some portion of each understatement is attributable to fraud.

The courts have developed a number of objective indicators or "badges" of fraud.  Recklitis v. Commissioner, 91 T.C. 874, 910 (1988).  Evidence that may give rise to a finding of fraudulent intent includes:  (1) Understatement of income; (2) inadequate or no records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5)

concealment of assets; (6) failure to cooperate with tax authorities; (7) failure to make estimated tax payments; (8) dealing in cash; (9) engaging in illegal activity; and (10) attempting to conceal an illegal activity. Clayton v. Commissioner, 102 T.C. 632, 647 (1994). These badges of fraud are nonexclusive. Miller v. Commissioner, 94 T.C. 316, 334 (1990).

In light of the record, taken as a whole and by reasonable inferences therefrom, we find that the facts show by clear and convincing evidence that petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.

The consistent understatement of large amounts of income for a number of years is evidence of willful intent to evade. Holland v. United States, 348 U.S. 121, 139 (1954); Rogers v. Commissioner, 111 F.2d 987, 989 (6th Cir. 1940), affg. 38 B.T.A. 16 (1938); Conforte v. Commissioner, 74 T.C. 1160, 1201 (1980), affd. in part and revd. on another issue 692 F.2d 587 (9th Cir. 1982); Otsuki v. Commissioner, supra at 107-108. We are mindful that fraud cannot be inferred from a mere inadvertent understatement of income. Holland v. United States, supra. Petitioner is an intelligent and financially astute individual.

Despite his business acumen, petitioner failed to report his receipt of substantial amounts of income on his 1982, 1983 and 1984 returns.  Hughes v. Commissioner, T.C. Memo. 1994-139; LiButti v. Commissioner, T.C. Memo. 1985-314.

A taxpayer's use of cash to conceal income is evidence of fraud.  Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; United States v. Chapman, 168 F.2d 997, 1000 (7th Cir. 1948).  Petitioner's method of paying the laborers in cash, and cashing their checks in larger amounts for himself without a valid business reason, is strong evidence of fraud.

Petitioner attempted to conceal the receipt of substantial amounts of income from the partnerships and Newtowne by entering into a series of transactions that camouflaged receipt of these funds.  For example, petitioner asked Newtowne to endorse the partnership checks to petitioner in "partial payment for his consulting services", even though it was understood between the parties that no such services would be provided.  Petitioner also caused the partnerships to pay him in accordance with the respective financial consulting agreements.[9]

_____

[9] We note that, despite these agreements, petitioner argued in his petition that these payments from the partnerships and

(continued...)

The failure to keep records of all earnings may be material evidence of fraud. Otsuki v. Commissioner, supra at 109; see also Baumgardner v. Commissioner, 251 F.2d 311, 314 (9th Cir. 1957), affg. T.C. Memo. 1956-112. To hold otherwise would, as the Supreme Court stated in United States v. Johnson, 319 U.S. 503, 518 (1943), "be tantamount to holding that skillful concealment is an invincible barrier to proof". During the years at issue, petitioner failed to maintain adequate books and records with respect to his financial consulting activity as required by law. Sec. 6001; sec. 1.6001-1, Income Tax Regs. In addition, petitioner failed to provide his tax adviser and return preparer with the records he did maintain.

Petitioner's conviction under section 7206(1) is also probative that petitioner intended to evade taxes for 1982 and 1983. Wright v. Commissioner, 84 T.C. 636, 643-644 (1985).

For the reasons stated above, we hold that petitioner is liable for the additions to tax for the tax years 1982, 1983, and 1984 pursuant to section 6653(b)(1).

(b)  Section 6653(b)(2)

---

(...continued)
Newtowne were not income.

We now turn to respondent's additions to tax under section 6653(b)(2). Section 6653(b)(2) imposes an addition to tax equal to 50 percent of the interest payable on the portion of the understatement attributable to fraud. Respondent must prove the portion of the understatement attributable to fraud. Sec. 6653(b)(2); DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), affd. 959 F.2d 16 (2d Cir. 1992).

Respondent asserts that the following amounts of income that petitioner failed to report on his 1982, 1983, and 1984 returns, respectively, are attributable to fraud for purposes of section 6653(b)(2):

|  | 1982 | 1983 | 1984 |
|---|---|---|---|
| Partnership fee income | $624,000 | $1,095,626.00 | $291,700.00 |
| Newtowne | 31,014 | 1,282,500.00 | -0- |
| Park Place | -0- | -0- | 180,000.00 |
| Saltergate | 120,000 | -0- | -0- |
| Cost savings | -0- | 106,037.66 | 230,657.69 |
| Bad debt deduction | -0- | -0- | 2,035,424.00 |
| Ford Van | 7,800 | -0- | -0- |
| Total | 782,814 | 2,484,163.66 | 2,737,781.69 |

### (1)  Partnership Fee Income

We have concluded that petitioner failed to report $624,000, $806,076, and $273,700 in partnership fee income for 1982, 1983, and 1984, respectively. Now we must determine what portion, if any, of each underpayment is attributable to fraud.

We conclude that respondent has met her burden of proving that $624,000, $806,076, and $273,700 in partnership fee income for 1982, 1983, and 1984, respectively, is attributable to fraud. In an attempt to camouflage or conceal his receipt of the partnership fee income, petitioner entered into complex transactions with numerous partnerships. Despite the written agreements petitioner entered into with the partnerships, petitioner failed to report as income the fees he received for the contracted services. Petitioner's failure to accurately report receipt of these funds was due to fraud.

(2) Newtowne

We have concluded that petitioner failed to report income he received from Newtowne in the amounts of $31,014 and $1,272,500 on his 1982 and 1983 returns, respectively. We have also concluded that petitioner failed to report income from the Saltergate I project in the amount of $120,000 on his 1982 return. Respondent asserts that $151,014[10] and $1,282,500 for 1982 and 1983, respectively, is attributable to fraud.

---

[10] Respondent determined that petitioner failed to report $31,014, or the difference between $158,000 and the amount reported on his 1982 return, $126,986. We added the $120,000 that petitioner failed to report from the Saltergate I project to the $31,014 for a total of $151,014. The $7,800 petitioner received for the Ford van is discussed infra.

As indicated, petitioner caused the partnerships to enter into market research and warranty agreements with Newtowne without expecting that the partnerships would receive services in accordance with the contracts. Petitioner "paid" for these nonexistent services with checks that were drawn on the partnerships' accounts and bore preprinted endorsements payable to himself. In substance, petitioner was simply draining the partnerships of funds and using Newtowne as a conduit to carry out this fraudulent scheme. The fact that petitioner did not expect that the partnerships would receive services from Newtowne indicates that the transactions were a sham. Petitioner's failure to report the income on his returns was due to fraud.

Of the $151,014 of unreported income in 1982, $120,000 represents the amount petitioner received from the limited partnerships in the Saltergate I project. Petitioner was in control of the limited partnerships and caused them to enter into financial consulting and warranty agreements. Newtowne credited the $120,000 to petitioner's purchase of the two office buildings. By this method, petitioner was able to surreptitiously drain the limited partnerships of $120,000.

Petitioner's failure to report this amount, and the method he utilized to obtain the $120,000, clearly indicate his intent to conceal his receipt of this income. Respondent has met her burden of proving that $151,014 and $1,272,500, for 1982 and 1983, respectively, is attributable to fraud for section 6653(b)(2) purposes.

(3) Park Place

Respondent alleges that petitioner failed to report $180,000 in income from Newtowne and the Park Place partnership on his 1984 return. Petitioner reported $30,525 in income from the Park Place partnership on his 1984 return.

Petitioner caused checks to be drawn on the Park Place, Ltd., partnership account totaling $180,000. These checks were made payable to Newtowne and were presented to Fankhauser with the following preprinted endorsement: "Pay to the Order of Albert J. DeSantis in Partial Payment of Consulting Services". It was agreed that petitioner would not provide Newtowne with the consulting services as indicated on the checks. Petitioner sent the checks by messengers to Newtowne's office where they waited for Fankhauser's endorsement before returning the checks to petitioner. Petitioner deposited the checks into his personal checking account at BancOhio.

The method by which petitioner withdrew funds from the partnership accounts, caused the checks to be paid to Newtowne, and caused Newtowne to endorse those amounts back to petitioner is clearly fraudulent given the parties' expectation that no services would actually be provided. Even if the parties anticipated that petitioner would perform the stated services, the amounts received would clearly be income. Sec. 61(a)(1). Petitioner's failure to report the entire $180,000 is also indicative of his intent to conceal. Because petitioner did report $30,525 of the income he received from Park Place, we hold that $149,475 is attributable to fraud for purposes of section 6653(b)(2).

### (4) Cost Savings

Respondent asserts that petitioner's failure to report $106,037.66 and $230,657.69[11] in cost savings on his 1983 and 1984 returns, respectively, is attributable to fraud for section 6653(b)(2) purposes.

Through his tactics, petitioner caused Newtowne to construct a 10,000-square-foot house. Petitioner financed the project with cost savings from various construction projects he caused the partnerships to enter into with Newtowne. As indicated,

---

[11] The $230,657.69 equals $200,657.69 in cost savings plus $30,000 in architectural services provided by Riat.

petitioner determined how much of the cost savings he would receive from line item savings in the construction budget for each project. Even though petitioner determined how much of the cost savings he was to receive, petitioner failed to report these amounts as income on his 1983 and 1984 returns. Petitioner also failed to inform Meeks that Newtowne was constructing his house, and that the cost savings were being credited to his construction account.

Petitioner's failure to report this income, coupled with the method by which he obtained the funds, indicates petitioner's fraudulent intent. We have found that petitioner failed to report $106,037.66 and $230,657.69 on his 1983 and 1984 returns, respectively. Accordingly, we hold that $106,037.66 and $230,657.69 is attributable to fraud for section 6653(b)(2) purposes.

### (5) Uncollectible Operating Expenses

Petitioner claimed a bad debt deduction in the amount of $2,516,224 on his 1984 return attributable to "Uncollectible operating advances". Respondent asserts that the entire amount of the underpayment due to petitioner's bad debt deduction is attributable to fraud. As indicated, we have held that petitioner was not entitled to claim the bad debt deduction in the amount of $2,035,424 on his 1984 return. We must now

determine what portion of the bad debt deduction claimed on petitioner's return is attributable to fraud.

The record is devoid of any evidence of loans being made to or by the partnerships. Meeks advised petitioner that he would have to file amended partnership returns to reflect the discharge of indebtedness income in order to claim the deduction. Petitioner knew that the deduction was improper and unsupportable. Petitioner did not follow the advice of his tax adviser. We conclude that the claimed deduction was for the sole purpose of evading tax.

Accordingly, on the basis of the record, we hold that the amount of $2,035,424 which petitioner claimed as a bad debt deduction was fraudulent in its entirety.

(6) The Ford Van

As indicated, Forster presented petitioner with a personal check in the amount of $7,800, payable to a Ford dealership, to enable petitioner to purchase a van. Petitioner failed to report this amount in income on his 1982 return. Respondent asserts that the entire $7,800 is attributable to fraud.

We hold that petitioner's failure to report the $7,800 on his 1982 return is fraudulent. Forster did not present the check to petitioner as a gift. Rather, petitioner coerced Forster by threatening to cancel Newtowne's project if Forster refused to

comply with his demand.  At the time, petitioner was aware that Newtowne was in dire financial straits and did not have other contracts.  Petitioner's failure to report the $7,800 as income is fraudulent given the manner in which the check was obtained and petitioner's attempt to characterize it as a gift.

(c)  Section 6661

Respondent determined that petitioner is liable for the additions to tax under section 6661[12] for 1982, 1983, and 1984.

Respondent's determinations are presumed correct, and petitioner bears the burden of proving otherwise.  Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

Section 6661(a) provides for an addition to tax equal to 10 percent of the amount of any underpayment attributable to a substantial understatement of tax.  An understatement, for purposes of this addition to tax, is the amount by which the amount required to be shown on a return exceeds the amount actually reported on the return.  Sec. 6661(b)(2); Tweeddale v. Commissioner, 92 T.C. 501, 505 (1989).  An understatement is substantial if it exceeds the greater of $5,000 or 10 percent of the tax required to be shown on the return.  Sec. 6661(b)(1)(A).

_____

[12]  Sec. 6661 is applicable to returns required to be filed after Dec. 31, 1982.

The amount of the understatement may be reduced under section 6661(b)(2)(B) for amounts adequately disclosed or supported by substantial authority.  In addition, section 6661(c) authorizes the Secretary to--

> waive all or any part of the addition to tax * * * on a showing by the taxpayer that there was reasonable cause for the understatement * * * and that the taxpayer acted in good faith.

Petitioner argues that there is substantial authority for the positions taken on his 1982, 1983, and 1984 returns with respect to the payments he received from the partnerships and Newtowne, and the bad debt deduction claimed on his 1984 return. Petitioner further argues that he acted in good faith and that there is reasonable cause for the understatements.  Finally, petitioner argues that he accurately described the relevant facts relating to the positions taken on his returns.

Petitioner has not demonstrated what authorities he purportedly relied upon for the positions taken on his returns. Nor has he shown that any authority he relied upon was substantial.  Given that we have found that petitioner fraudulently, and with the intent to evade tax, substantially understated his income tax for the years in issue, we cannot conclude that petitioner acted in good faith or with reasonable cause with respect to the positions taken on his 1982, 1983, and 1984 returns.  Furthermore, we have found that petitioner did not

fully disclose all of the facts to his return preparer, Meeks. In addition, petitioner did not make adequate disclosures on his returns.  Accordingly, respondent's determination is sustained.

To reflect the foregoing,

An appropriate order will be issued and decisions will be entered under Rule 155.[13]

---

[13] The $180,000 petitioner reported as "other consulting fees" on his 1984 return should be subtracted from the total amount of income we have determined that petitioner failed to report from the partnerships and Newtowne.